Putnam J.
drew up the opinion of the Court, (Wilde J. *325 dissenting.)* The demandant claims the land demanded, as minister of the first parish in Reading, as parsonage land. If "the premises were to be considered strictly as parsonage land at the time when the parish made a deed with warranty thereof to Mr. Prentiss, it is clear that the deed did not convey the fee simple. For by Prov. St. 28 Geo. 2, and St. 1785, c. 51, the minister is a sole corporation and holds the parsonage in succession. And the alienation of the parish, without his consent, would not divest the estate from the corporation. This is fully settled in the cases of Weston v. Hunt, 2 Mass. R. 500 ; Austin v. Thomas, 14 Mass. R. 333 ; Brown v. Porter, 10 Mass. R. 93 ; Brunswick v. Dunning, 7 Mass. R. 445. And it has been argued for the demandant, that these cases clearly call for a decision in his favor.
The case of «Austin v. Thomas is urged as exceedingly like that under consideration, as the town of Worcester undertook to sell the parsonage land to their minister, in the same manner as the first parish in Reading did to their minister. And so it would be, if it should be taken for granted, what was clearly proved in that case, that the estate demanded was strictly and technically parsonage land. In that case the town of Worcester appointed a committee to purchase a messuage for the use of the ministry. They accordingly bought the land of Samuel Breck, who conveyed it to John Chandler for the use of the town as a perpetual parsonage.
But the town of Reading held the demanded premises as an absolute estate in fee simple, before they passed the votes of 1712 and 1713. Whether those votes can or should be construed as a grant to the parish for the permanent use of the ministry, is to be determined by reference to the terms they used, and the manner in which the inhabitants conducted themselves in regard to the property. We are to ascertain the intent of the parties by their votes and doings proved in the case. And if it should appear that the town intended to divest themselves of the seisin in fee and to vest it in the minister, beyond their control, then it would be a strict parsonage. If otherwise, then the parish might lawfully sell and convey the estate as they did, to Mr. Prentiss.
*326 We do not doubt but that a town may, if they will and intend their votes appropriate lands for the permanent use of the ministry. It would be a question of the true intent and meaning of the votes or records. If it could be collected that thev intended to alter the seisin, and to vest it in the'minister as a sole corporation, for the use of the ministry, the statute of 1754 before cited would enable them to carry such intent into effect. On the other hand, if it were manifest that the appropriation was not intended to alter the seisin and title, the property would continue to be at the disposal of the town.
Let us consider what the town of Reading have done in this respect. In 1712 they voted “to fence in three and a half acres of land for the use of the ministry.” But the next year the town voted “ to take up and fence in four acres in lieu of the three acres and a half.” Those four acres are the demanded premises. Those votes were passed before the town was divided into several parishes. It is very clear that the town considered that they had a right to take up and lay down at their pleasure, any of their lands, for ministerial as well as other purposes, as the occasion required.
Were the three and a half acres, which were in lieu of the four acres, still continued for the permanent use of the ministry ? Did the town intend to give up the right to manage the property as they pleased ? The words which the town employed are not conclusive upon the question. “ They would fence in a lot for the use of the ministry.” “ They would take up a lot for the use of the ministry.” ’ Do these terms necessarily mean, that the town should from thenceforth and forever cease to have the right to dispose of the estate ?
The contemporaneous doings of the town, explain their meaning. They considered the lands as funds from which they drew, as occasion presented, for the support of public worship. The year before the vote to fence in the three and a half acres, the town voted to raise a committee to see what lands should be used as ministerial. They exchanged, sold, or leased the lands which they called ministerial, just as they pleased, and, when they chose to do so, they carried on what they called'the parsonage themselves. In short, they managed those lands as their absolute estate in fee. The ministérs, for *327 aught that appears, never received the idea, that they had the seisin or right in themselves, from the beginning of their settlement up to the time when the land was conveyed to Mr. Prentiss.
In Brunswick v. Dunning, 7 Mass. R. 445, the land belonged in fee to the Pejepscut proprietors. They voted to lay it or.'t for the use of the ministry in the town, and it appeared that several ministers held the same in succession during their ministry. The intent to make a permanent appropriation was plain. But in the case at bar, the minister or ministers of Reading made no claim in their official character, but occupied occasionally, just as the town permitted.
The intent of the original proprietors to make a permanent appropriation or grant of one right, was supposed to be clearly made out in the case of Brown v. Porter, 10 Mass. R. 93. The proprietors appropriated and the town accepted of the appropriation, as appeared by their votes. But in the case at bar there was no purchase made by, or grant to the town or parish from another party who owned the estate.
In Brown v. Porter, the Court remarked, that “it was not pretended that the tenant held or claimed the lot demanded, under any license or title derived from the parish or from the demandant (the minister) or any of his predecessors in the ministry.” But in the case at bar, the tenant does claim title under the deed of the parish, in which they covenanted and granted that their grantee and his heirs and assigns should have the premises forever free from all incumbrances. And the demandant is claiming this estate for the benefit of the parish.
It is contended, however, that by force 'of the statute of 1754 the vote of 1713 became a grant of parsonage land and vested the land in the minister for the time being, and his successors, in fee simple, in right of the parish, or in the language of the vote, “ for the use of the ministry.”
That statute recites, that “whereas many grants and donations have heretofore been made by sundry well-disposed persons, in and by such expressions and terms as plainly show it was the intent and expectation of such grantors and donors, that their several grants and donations should take effect so as *328 that the estates granted should go in succession,” and proceeds t0 ascertain in what cases such donations and grants may operate so as to go in succession. And among divers cases stated, it provides “ that the minister or ministers of the several protestant churches, of whatever denomination, are and shall be deemed capable of taking in succession any parsonage land, or lands granted to the minister and his successors, or to the use of the ministers. ”
Now it is manifest that this statute applies only to grants wherein it appeared that the grantors plainly intended the estates should go in succession. Try the case at bar by that criterion. There was no grant originally designating any particular portion of the township for the use of the ministry, an the town, in its parochial character, used the whole as the; thought it expedient; cutting wood on some of their lands, anc cultivating and permitting the minister to use other of their lands from time to time, varying the place and the quantity according to the will of the town. How can it be maintained that appropriations so made for the use of the ministry, “ plainly show that it was the intent and expectation that the estates should go in succession ” ? The votes of 1712 and 1713 seem to negative such intent. They appropriate in 1712, for the use of the ministry, three and a half acres ; but so far from intending or expecting the land to go in succession, in 1713 they appropriate the four acres (the lot in controversy) in lieu of the three and a half acres. So far from intending that the three and a half acres should go in succession, it is perfectly clear that they did not intend they should be used as ministerial lands after one year. Now the intent, as manifested by the votes, was the same in regard to both lots. If the statute had been then in full force, and the minister in 1714 had sued for the three acres and a half of land, could he have maintained his claim, according to its true construction ? The town would have replied, and with effect too, this was and is our land ; the vote of 1712 was for a temporary, and not a permanent appropriation for the use of the ministry, and we manifested our intent by discontinuing the use of that lot and substituting another for the purpose. And they might have well added, that when it suits our convenience, we shall dispose of the other ; for thiy *329 was not land granted to us for the use of the ministry, but it was our own unincumbered absolute estate, which we mean to use, as may seem to be most for our interest. Whether the final disposition was made in one year, or after many years, makes no difference in the principle, the town in the mean time occupying or permitting the minister or others to occupy at their pleasure. The calling the estate parsonage land or ministerial land, would not make it so in the technical sense, so as to vest the seisin in the minister, unless such intent were originally plain. Nor would any mode of improvement, whether for agriculture or building, of itself, control the intent not to part with the fee and the seisin on the part of the town.
The votes of the town to which we are referred as parts of the ease, are, under the circumstances, to be considered rather as agreements how the common lands should be managed from time to time, than as a grant of the title or seisin, which would deprive the town thereafter from making any other disposition of the same.* The evidence is, that the town continued to control and direct and manage the property as their own, without the assent or leave of the minister ; but there is no evidence that the minister ever claimed to hold and occupy against or without the assent and leave of the town. How is it “ plainly shown ” that the lands should go in succession ? Take their votes all together, from first to last, and such an intent is rebutted.
It has been contended for the demandant, that a parish cannot take and hold land for any purpose but for a site for a *330 meetinghouse, or as parsonage for the minister. The parish may be seised of the land for the purpose of supporting a minister out of it, and yet it may not be the property of the minister so as to make it technically a parsonage, and cause the seisin to be in the minister as a sole corporation.
In the case of Thompson v. The Cath. Cong. Soc. in Rehoboth, 5 Pick. 469, the plaintiff, as minister, sued for the proceeds of real- estate given in 1774 by one Ephraim Hunt “towards the support of public worship for the benefit of the inhabitants of the second precinct of Reboboth who should attend meeting at the church at Palmer’s river.” The will directed that the estate “ should be leased out and the yearly income and rents paid to the minister of the church at Palmer’s river.” The society reserved the income of this estate to themselves, and agreed with the minister for a certain salary less than the income ; and the Court held that he could not recover. The income must therefore have belonged to the parish. It appears that in 1792, this society was in possession of a “ considerable real estate,” and it was incorporated with all the powers, privileges and immunities that precincts and parishes enjoy. St. 1792, c. 2, Spec. Laws, vol. 2, p. 367. This precinct therefore must have had a capacity to take and hold for ministerial purposes, independently of the minister.[1]
We regret that the present chief justice cannot give us any aid, as he was of counsel in this case. We have also to regret that the other members of the Court have not been able to *331 arrive at the same result. The circumstance that our brother Wilde dissents from the opinion which we have formed, is calculated to excite our distrust of its correctness. But after much consideration, we are of opinion that the demandant should be nonsuited, and that judgment should be entered accordingly.

 Shaw G. J. did not ait in the cause, having been counsel.

 On March 4th, 1706, the town exchanged part of the ministerial lands with Mr. Hartshorn.
On July 17th, 1711, the town chose a committee to consider the quantity of land and place for the ministry, and to make report.
May 14th, 1716. Gave Mr. Richard Brown the use of the ministerial meadow so long as he should continue minister.
May 9th, 1727. Allowed Mr. Putnam part of the ministerial meadow, and the rest is to he brought into the old parish treasury.
October, 1741. Exchanged ministerial land with Lieut. Parker.
April 21st, 1742 The town gave and granted Rev. Wm. Holley and Mr Putnam their equal proportion of the ministerial meadow
In 1753, exchanged with Mr. Woodward.
March 1st, 1762, sold a piece of ministerial land to Andrew Beard.
May 24th, 1770. Committee chosen to look up all the lands in the town *330 not yet disposed of, and among other lots, “a parcel of woodland in Sledge woods, so called, near Barchen meadow, called ministerialIt would seem notwithstanding the meadow was called ministerial, the town had not disposed of it
In October, 1766, the first parish voted, that they reserved the use of the parsonage lands to themselves.
1767. That the committee of building the new meetinghouse have liberty to cat timber from the ministerial lands.
Sept. 20th, 1770. Art. 1. To know if the parish will sell the parsonage. Voted in the affirmative. Sold it in three pieces; that where the house stands, that behind the meetinghouse [the lot in controversy] and that by Doct. Stimpson’s.
March 17th, 1777. Committee of the parish authorized to give a deed te Rev. Caleb Prentiss.

 See First Parish in Medford v. Medford, 21 Pick. 199.